UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHAD McKINNEY,

        Petitioner,

        v.                       CAUSE NO. 3:15CV369-PPS/MGG

SUPERINTENDENT,

        Respondent.

## OPINION AND ORDER

Chad McKinney, a prisoner without a lawyer, filed an amended habeas corpus

petition to challenge his conviction and sentence for murder following a jury trial. On

May 17, 2006, the Marion Superior Court sentenced McKinney to fifty-five years of

incarceration.

## Factual Background

In deciding this habeas petition, I must presume the facts set forth by the state

courts are correct unless they are rebutted by clear and convincing evidence. 28 U.S.C. §

2254(e)(1). The victim of the murder was a man named Anthony Laurenzo who was

shot in the head in an unfortunate incident involving the all too common mixture of

drugs and guns. The evidence at trial was a bit convoluted.  But here is how the Court

of Appeals of Indiana summarized what happened:

> On the night of December 19, 2003, Dominick Bruno ("Dominick") and
> Anthony Laurenzo ("Laurenzo"), who had been a groomsman in
> Dominick's wedding, procured some LSD and then went to Dancer's
> Show Club in Indianapolis. Both men consumed some of the LSD before
> entering the club. After a few minutes, Laurenzo began acting abnormally,

alternating between periods of quiet with his head between his knees and periods where he had a great deal of energy, was shaking, and was yelling, "Oh, Jesus." The club's doorman saw Laurenzo crying and rubbing his chest and believed that Laurenzo was hallucinating. Eventually, the doorman asked Dominick to take Laurenzo out of the club.

About that time, Dominick received a call from his wife, Connie. Connie, who was eight-and-a-half months pregnant, was at the couple's trailer home with their young son, Joseph. Connie told Dominick that McKinney, who had also been a groomsman in Dominick's wedding, was at the home and needed to see him. According to Connie, McKinney had been drinking whiskey and seemed sad. Dominick and Laurenzo left the club and drove to the Brunos' home. During the drive, Laurenzo was swinging his arms and talking with God and Jesus. Twice during the drive, Dominick pulled over to calm Laurenzo.

After they arrived at Dominick's home, Dominick led Laurenzo inside. McKinney was lying on the floor near the door, and Laurenzo stepped on him. Laurenzo was still swinging his arms, and he hit McKinney. McKinney pulled Laurenzo onto a couch and started hitting him before Dominick and Connie separated them. Dominick told McKinney that Laurenzo was "on a bad trip" from the LSD, that he was "not trying to hurt nobody," and that McKinney should leave him alone. At that point, Laurenzo was foaming at the mouth and claiming that he was God and "the most powerful man in the world." Connie tried to give Laurenzo a glass of milk, but Laurenzo threw it or knocked it out of her hand. Dominick left the room to check on Joseph and returned to find McKinney beating Laurenzo up again, and Dominick again separated the two.

McKinney eventually left the trailer, but he returned approximately ten minutes later with a purple Crown Royal bag and a white glove. By that point, Laurenzo had "actually started to listen" to Dominick "a little bit." Nonetheless, McKinney removed a small pistol from the purple bag and pointed it at Laurenzo. McKinney then fired a shot while the gun was pointed at the ground. Dominick told McKinney, "Look, you just shot a bullet. You need to go. I got a son here, I've got a pregnant wife. You know this is not good. You need to leave now." McKinney placed the gun on an entertainment center but did not leave. Laurenzo was still standing and claiming to be God and the most powerful man in the world. Connie told Laurenzo to sit down, and Laurenzo approached her "like he was going to hit [her] or something." Connie told Laurenzo, "I'm pregnant and you're not going to hit me," and Laurenzo did not do anything to her.

Connie then called 911 to get help for Laurenzo. While she was on the phone, McKinney approached Laurenzo, put him in a headlock, pushed the gun against his temple, and shot him in the head. Laurenzo immediately fell to the floor.

Dominick saw McKinney drop the gun, and McKinney left the trailer. Laurenzo died of "a through-and-through contact gunshot wound to the head." Dominick and Connie gave statements to the police and identified McKinney as the shooter. Police found a gun broken into several pieces on the floor of the trailer.

After McKinney was arrested, he reported to a doctor at the Marion County Jail that he had a bullet lodged in his hand. He subsequently removed the bullet himself using a razor blade and gave it to a guard. Testing showed that the bullet had been fired from the gun recovered by police. Furthermore, McKinney's wound was consistent with the exit wound on Laurenzo's head because the exit wound indicated that something was resting against Laurenzo's skin, possibly McKinney's hand. Finally, DNA testing showed that Laurenzo's blood was on the barrel of the recovered gun and on McKinney's jacket.

The State charged McKinney with murder, a felony. A jury trial was held on August 15–17, 2005. . . . On August 17, 2005, the last day of the trial, the jury was unable to reach a verdict, and the trial court declared a mistrial and scheduled another pre-trial conference. . . . The second jury trial commenced on April 24, 2006. . . . The jury found McKinney guilty of murder. . . . Judge Gifford sentenced McKinney to a prison term of fifty-five years, the presumptive sentence for murder.

ECF 36-7 at 2-8; *McKinney v. State*, 873 N.E.2d 630, 635-38 (Ind. App. 2007).

In the amended petition, McKinney argues that he is entitled to habeas relief because trial counsel denied him his right to testify at trial. He also argues that he received ineffective assistance of trial counsel with respect to requesting a self-defense instruction; failing to present a pathology expert; failing to present a firearms expert; failing to timely request a change of judge; failing to prepare for the sentencing hearing;

failing to challenge the chain of custody for the gun; and failing to object to fabricated forensic evidence as prosecutorial misconduct.

McKinney further argues that he is entitled to habeas relief because he received ineffective assistance of post-conviction counsel. While ineffective assistance of post-conviction counsel may, under some circumstances, constitute an excuse for procedural default, it is not a cognizable basis for habeas relief as a freestanding claim. *Coleman v. Thompson*, 501 U.S. 722, 752 (U.S. 1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.").

Some of these claims are knocked out by procedural default. And the other claims have no merit. I'll address the issues barred by the doctrine of procedural default first.

## **Procedural Default**

Before considering the merits of a habeas petition, I must ensure that the McKinney has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). This involves navigating a process that is chock full of traps for the petitioner. Fall into one, and your claim is a goner. To get the merits of a claim considered in federal court, a petitioner must first have fully and fairly presented his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (*citing Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to

4

assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id*. at 1025-26. "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id*. at 1026.

McKinney raised his claims regarding ineffective assistance of trial counsel for denying him his right to testify and for failing to timely move for a change of judge at each of the three levels of the State court system. ECF 36-9; ECF 36-12. But his remaining claims are procedurally defaulted either because: 1) he did not raise them with the Marion Superior Court; 2) he did not raise them in his petition to transfer to the Indiana Supreme Court; or 3) because he did not raise them at any level. Those claims are therefore procedurally defaulted.

As an excuse to procedural bar for these claims, McKinney asserts that he received ineffective assistance of counsel during the post-conviction relief stage. Federal courts may consider procedurally defaulted claims if the petitioner demonstrates "cause for his default and prejudice resulting therefrom, or that a miscarriage of justice will result if we do not consider the merits of his case." *Anderson v. Benik* 471 F.3d 811, 815 (7th Cir. 2006). As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples v. Thomas*, 565 U.S. 266, 280

5

(2012). But "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017). "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.

McKinney raised the claim that trial counsel provided ineffective assistance with respect to sentencing to the Marion Superior Court and the Court of Appeals of Indiana but abandoned it in his petition to transfer to the Indiana Supreme Court. ECF 36-9; ECF 36-12. Consequently, this claim cannot be excused under *Martinez*, which applies only to claims that were procedurally defaulted "at initial-review collateral proceedings." However, I will discuss the substantiality of the remaining procedurally defaulted claims below.

## Legal Standards

Having worked our way through the procedural thicket that plagues habeas corpus litigation, it is now on to the merits of the claims that survive. But first, some basics about the standards that govern the decisionmaking. Habeas corpus is an important error correction tool that helps to ensure the proper functioning of the criminal justice system. "Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted). Habeas relief can only be granted in one of two ways: if it is shown

that the adjudication of the claim by the state court resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if the state court decision was based "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is a demanding standard that has been described by the Supreme Court as being "intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings . . . of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376 (quotation marks and citations omitted). What this means is that to succeed on a habeas claim the petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id*.

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

One of the most common ways to get a state criminal conviction reviewed in federal court is by claiming ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

## Discussion

### 1. Alleged Denial of Right to Testify

McKinney argues that he is entitled to habeas relief because trial counsel refused to allow him to testify. He maintains that his testimony was necessary for him to pursue a self-defense strategy at trial and contends that such a strategy would have likely resulted in a favorable outcome at trial. "[A] criminal defendant has a constitutional right to testify in his own behalf under the fifth, sixth, and fourteenth amendments." *Alicea v. Gagnon*, 675 F.2d 913, 923 (7th Cir. 1982). "An ineffective assistance of counsel claim is the appropriate vehicle in which to allege that counsel violated a defendant's

8

right to testify." *Hartsfield v. Dorethy*, 949 F.3d 307, 312 (7th Cir. 2020). "The decision not to place the defendant on the stand is a classic example of a strategic trial decision." *United States v. Stuart*, 773 F.3d 849, 853 (7th Cir. 2014) (internal quotations omitted).

Trial counsel in this case did not rely on a single narrative to undermine the prosecution's case but instead characterized their case as flimsy and well-short of satisfying their burden of proof. [ECF 16 -- Trial Tr. 674-708]. For instance, trial counsel noted the material differences between testimony of key witnesses — including the Brunos (the only eyewitnesses presented at trial) and the forensic experts. Each of them was effectively impeached with prior statements and this was pointed out by counsel in closing argument. *See e.g.,* Trial Tr. 122-27, 250-53, 271-80, 341-50, 544-45. Counsel's argument was not to concede that McKinney had fired the gun but to suggest that Dominick Bruno committed the murder, noting that he was in a manic state caused by bipolar disorder and had consumed hallucinogens and alcohol that night. *Id.* at 685, 704-05.  She also attempted to create doubt by arguing that the victim's drug dealer or a disgruntled bar patron committed the murder, noting that he had obtained LSD and that patrons had noticed the victim's unusual behavior at the bar earlier that night. *Id.* at 688-90, 702-03. She further noted unexplained calls on Dominick Bruno's cellphone and Connie Bruno's call to 911 in which she described the shooter as a man she did not recognize. *Id.* at 679-80. All of this was an effort to sow doubt about the identity of the shooter.

At the post-conviction relief stage, McKinney testified as follows:

**Q:** Did you request to testify at the second trial?

**A:** Yes.

**Q:** Why didn't you testify?

**A:** [Trial counsel] wouldn't let me.

**Q:** Why did you feel that your testimony would be helpful?

**A:** Because we were asking for a self-defense instruction and my observation of events, you know, I was being the third person there, other than the victim, of course and the two-year-old boy, was crucial. There was so many things throughout . . . throughout these trials that got misconstrued. People's perceptions were . . . altered because either they were on drugs or they were . . . we had one, the eight-and-a-half-month pregnant woman, obviously a very stressful situation. Chaos going on. And I'm the only one that can answer certain questions, certain things about this case. I'm the only on that would know how the gun came apart or these certain things, you know, so. I couldn't see why I couldn't testify.

PCR Tr. 16-17.

McKinney further testified at the PCR hearing about the events at the Bruno residence. According to McKinney, had he testified at trial he would have talked about what happened when he returned to the residence with his gun in hand. Here's what he told the PCR judge he would have testified to:

**Q:** And so after you held him down the first time and everybody is kind of pitching in to help, what happens at that point?

**A:** This goes on over and over. He would calm down for a second and then he would start attacking me again. And throughout this time his . . . I'm the only one he's . . . he's being aggressive towards. It became a point in time . . . I . . . I would say that, you know, he attacked me, you know, five, six times. It became a point in time Connie got a glass of milk to try to get him to come out of this acid trip, to come down or to help him calm down or whatever. So then he, you know, he threw the milk at me and missed and hit the like the wall or counter behind me. And then Connie was going to try to tie him down in a chair with a belt. We're all participating. Well, Dominick's not. He's dazed behind me and he's just

saying things like, "Well, Tony, now we're serious, calm down. Tony, we're serious, calm down." So we're trying to tie him down with a belt which was . . . no, it didn't work. The chair broke. And then at that point we thought well he's only being aggressive with me. So the idea was to get me out of the situation to see if he would calm down. And so . . . so Connie . . . Connie said Dominick take Chad, why don't you guys get out of here and see if he calms down.

**Q:** Did you leave?

**A:** I went past the front door. I went to check on Joey. And then I went out of the front door and I stood right by the front door. Dominick never followed. And I'm just looking, observing to see what's going on. And he's still being . . . you know, he's being somewhat calm. He's standing there. I seen the three of them. Then all of a sudden I seen [the victim] start attacking Dominick at that point or start hitting Dominick.

**Q:** So what did you do?

**A:** So then I went back in. Or at that point while I'm . . . or I apologize. I grabbed my jacket, my keys and my cigarettes before I left and went down the other side of the trailer. So when at that point I realized I had the . . . the weapon on me and when I came back in I took the weapon out of my pocket. The same pocket I had earlier put the . . . the bag of Crown Royal. The Crown Royal comes with a purple bag around the bottle. I'd earlier stuck that in the same pocket the gun was in. So took the gun out, the bag came out with it. Just threw the bag on the floor or whatever. And . . . oh, I was trying to make sure that the gun wasn't loaded. I was going to use the gun to scare [the victim] with. You know, nothing else had worked at that point. While doing this I accidently shot myself and . . .

**Q:** Where did you shoot yourself?

**A:** In my left hand. So . . . and I had it down more towards the floor. Shot myself. You know, I felt the shot. You know, it burned. But at that same time the sleeve came off of the gun and I put the sleeve on the entertainment center and at this point in time I had actually felt that I had taken the clip out before I fired that shot and accidently shot myself in the hand. Obviously now I know that I had not taken the clip out yet. So I took the clip out. The clip and the slide at the top of the gun went on top of the entertainment center. At this point in time, this is the most . . . this is an important part of this. I had a shell of a gun that I didn't even think would operate or fire. I also thought it was unloaded. And so . . . so from

then I went . . . Dominick is . . . or I'm sorry, [the victim] is swinging on Dominick and they're fighting. I've got the gun in my right hand. I'm trying to pull [the victim] off of Dominick with my left. And at some point sat the gun to my right on the . . . where the coffee table had been. Because of us fighting it had been moved around and well things had been broken and whatnot, so I sat it over to the right and I'm trying to get [the victim] to back off Dominick. Back to the . . . the section of the couch that throughout all this we'd been trying to keep him detained.

**Q:** Okay. And at some point somebody decided to call 911?

**A:** Yeah, Connie had said right around this time, Connie had said should I get help? And I agreed and I said you're going to have to call someone. At that point in time she proceeded to call 911. Or you know . . . [the victim] had also realized at this point in time that she was going to call 911. And [the victim] is saying, man, don't call. Don't call the police on me. Don't . . . I'm fine. Don't call the police on me. And then he's starting to act erratic towards Connie. So [the victim] was on the couch. He gets back up off of the couch. Connie is to [the victim's] right, which would be my left in the kitchen where the phone is. At this point in time, you know, I hear Connie say, "No, Tony, you can't hit me." That she was about eight and a half months pregnant. [The victim] is screaming and yelling throughout the whole night. I mean throughout all these things he's screaming and yelling these crazy things, so. I had picked the gun back up that I thought was unloaded and wouldn't even work. And I'm trying to threaten him with it. He's trying to get at Connie. I'm holding him with my left hand and I've got him in like a full nelson. And we're struggling. I'm trying to hold him back. And then you know at this point in time while she's calling 911 is when I accidently shot him.

*Id.* at 35-38.

At the same evidentiary hearing, trial counsel testified that McKinney had told her that "he absolutely did not want to testify" based on his concern that the bullet lodged in his hand was particularly incriminating. *Id.* at 23-24. She testified that she rarely placed clients on the stand and likely advised McKinney against testifying. *Id.* Her trial strategy was to implicate Dominick Bruno and to portray the Brunos' testimony as an effort to avoid incriminating themselves. *Id.* at 24-25. She believed that

12

the fact that McKinney had left the house and returned with a gun would have made a self-defense theory a fool's errand. *Id.*

The Marion Superior Court rejected the ineffective assistance claim about McKinney testifying, and McKinney appealed. ECF 36-11 at 11-12. The Court of Appeals of Indiana credited trial counsel's testimony that McKinney did not want to testify. *Id.* The appellate court also found that counsel's decisions to implicate Dominick Bruno and not to present McKinney as a witness were reasonable strategic decisions and thus did not constitute deficient performance. *Id.*

After reviewing the record, I cannot find that the State court made an unreasonable determination with respect to trial counsel's decision not to call McKinney as a witness. As an initial matter, I must presume that State court findings are correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). McKinney testified that he wanted to take the witness stand at trial and also submits two affidavits from his relatives to that effect. ECF 62-1 at 2-4. But his lawyer, whose testimony was credited by the PCR court, testified to the contrary. As just stated, I have to presume that the State court findings of fact are correct unless rebutted by clear and convincing evidence.  McKinney has failed to meet this high bar.

What's more, I'm not at all convinced that McKinney's proposed trial strategy would have increased his likelihood of success at trial. Under Indiana law, "[f]or a claim of self-defense to prevail, the defendant must show that he (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm." *McEwen v. State*, 695

N.E.2d 79, 90 (Ind. 1998). Even setting aside Dominick Bruno's testimony describing McKinney as the aggressor, the record reflects that the Brunos asked McKinney to leave their home twice. Trial Tr. 80-86, 231-37; PCR Tr. 36. Yet McKinney came back inside armed with a pistol. It is difficult to see how a claim of self-defense would have gotten much traction under those circumstances.

McKinney's testimony would have also opened the door for questioning on multiple topics that could have harmed his case. For example, he likely would have been asked how he shot himself in the hand in a way that the bullet became embedded in his hand without producing an exit wound. He likely would have been asked how the wound to his left hand was consistent with his testimony that he had the victim in a full nelson hold[1] as he fired the fatal shot, as well as the mechanics of and the thought process behind his efforts to physically subdue and scare the victim after having suffered such a significant wound himself. It is unclear how McKinney would have answered such questions in a manner that did not significantly undermine his credibility or increase the likelihood of a guilty verdict. More generally, the decision to testify also includes many risks that are applicable to all criminal defendants. The prosecution could seize on a minor misstatement to attack the criminal defendant's credibility or as support for their case, or the jury may simply not like the criminal defendant.

---

[1] A full nelson is "a wrestling hold gained from behind an opponent by thrusting the arms under the opponent's arms and clasping the hands behind the opponent's head." Merriam-Webster, https://www.merriam-webster.com/dictionary/full%20nelson (last visited Nov. 4, 2020).

By contrast, though trial counsel's strategy also had flaws, it did not expose McKinney to the risks of cross-examination. By suggesting that Dominick Bruno committed the murder, the strategy provided a motive for the Brunos' decision to testify in support of the prosecution's case against him. And trial counsel had used the same strategy in the first trial with some success, persuading six members of that jury that McKinney should have been acquitted. ECF 36-9 at 5.

In sum, the Indiana Court of Appeals did not unreasonably apply the *Strickland* standards in determining that the decision to not have McKinney testify at trial was a sound strategic decision by trial counsel. And so, there is no basis for habeas relief on this ground.

### 2.   Motion for a Change of Judge

McKinney argues that he is entitled to habeas relief because trial counsel did not file a timely motion for a change of judge.  Here's how the issue arose in state court. On the first day of the first trial, the trial judge informed the parties that the victim's mother had worked for her in the early 1980's and asked if the parties had any concerns. Direct Appeal App. 491-97. Trial counsel decided not to ask for a mistrial or recusal at that time because "she felt she was winning the trial." *Id.* After the first trial, trial counsel did move for a change of judge, but the trial court denied the motion as untimely and without merit because there was no showing of bias or prejudice. Supp. Direct Appeal App. 1-4. On direct appeal, the Court of Appeals of Indiana affirmed the trial court on both grounds. ECF 36-7 at 8-12. It noted that twenty years had passed between the termination of Laurenzo's mother's employment with the court and the trial. And more

to the point, there was no evidence to suggest any other relationship between the victim's mother and the trial judge during that time. *Id.* It also noted trial counsel's statements that she believed the trial judge was fair and that she had a good relationship with the trial judge. *Id.*

At the post-conviction stage, trial counsel testified that she did not perceive any bias from the trial judge and that her understanding was that the employment relationship ended on poor terms. PCR Tr. 26-29. The appellate court found that the decision to not move for a change of judge earlier was a reasonable strategic decision and thus did not constitute deficient performance. ECF 36-11 at 14-16. The appellate court further found a lack of prejudice given its prior finding that the motion would have been denied even if it was timely and given the absence of any indication that the outcome of the case would have been different with another trial judge. *Id.*

It is worth returning to the standard governing my review of this ineffective assistance of counsel claim. Recall that it is a "high standard" and "even 'egregious' failures of counsel do not always warrant relief." *McNary*, 708 F.3d at 914. On this record, there is no indication that a motion to change judge would have been granted if it was timely or that the outcome of the case would have been different if the motion had been granted. Therefore, the claim regarding the motion for a change of judge is not a basis for habeas relief.

### 3. **Post-Conviction Counsel Claims**

McKinney argues that post-conviction counsel provided ineffective assistance by failing to pursue four ineffective assistance of trial counsel claims in the Marion

16

Superior Court and that I should excuse the procedural bar on these four claims. "[A]
prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-
counsel claim is a substantial one, which is to say that the prisoner must demonstrate
that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012). Consequently, I
will now consider whether these claims have any merit.

### a.  Self-Defense Instruction

McKinney argues that post-conviction counsel should have asserted that trial
counsel was ineffective for requesting a self-defense instruction without offering
evidence to support it. He maintains that the instruction acted as an admission that he
was the shooter in direct contradiction to the trial strategy. The self-defense instruction
read as follows:

> A person may use reasonable force against another person to protect
> himself from what the person reasonably believes to be the imminent use
> of unlawful force.

> A person is justified in using deadly force only if he reasonably believes
> that deadly force is necessary to prevent serious bodily injury to himself
> or a third person.

> However, a person may not use force if he has willingly entered into a
> fight with another person or started the fight, unless he withdraws from
> the fight and communicates to the other person his intent to withdraw
> and the other person nevertheless continues or threatens to continue the
> fight.

> The State has the burden of proving beyond a reasonable doubt that the
> defendant did not act in self-defense.

Direct Appeal App. 638. The jury instructions also read, "The defendant was not required to present any evidence to prove his innocence or to explain anything," and, "A defendant must not be convicted on suspicion or speculation." *Id.* at 631, 645.

At closing, trial counsel argued:

I think you could tell, I was somewhat bothered by [the prosecution] on a couple of occasions [telling] you what the defense arguments would be, and he talked about self-defense and voluntary manslaughter, and my argument is as to that, this is an attempt by the State to shift its burden of proof onto the defense making that type of argument to the jury, getting up here and telling you what we're going to argue, because remember, Chad McKinney has to prove nothing. Remember in our voir dire when we discussed that? That is called the United States Constitution, and I hope that you all hold it near and dear. He has no burden of proof in this case. The burden of proof rests on the State of Indiana. And indeed, [the prosecution] did not read to you the part of the jury instructions he referenced. In particular, the first instruction of self-defense, [the prosecution] failed to read to you that the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. . . . I hope you understand that that is a critical part of how jurors should analyze the evidence in this case.

Trial Tr. 674-75.

After reviewing the record, I disagree with McKinney's contention that trial counsel's request for a self-defense instruction acted as an admission that McKinney shot the victim. As a general proposition, "[courts] presume that juries follow instructions." *Perry v. McCaughtry*, 308 F.3d 682, 690 ( 7th Cir. 2002). Here, the jury instructions clearly articulated that the burden of proof relating to self-defense rested with the prosecution. There are certainly cases in which a trial counsel concedes that the criminal defendant killed the victim but argues that the need for self-defense justified the killing, but, here, trial counsel emphatically insisted during closing arguments that

18

that was not her strategy. Instead, by requesting a self-defense instruction, trial counsel merely increased the prosecution's burden by requiring them to *disprove* self-defense in addition to proving the elements of murder. A claim at the post-conviction relief stage that trial counsel was ineffective for requesting the self-defense instruction would have been futile, so I find that post-conviction counsel was not ineffective for declining to pursue such a claim, which remains procedurally barred.

### b. Pathology Expert

McKinney argues that post-conviction counsel should have asserted that trial counsel was ineffective for failing to hire a pathology expert to rebut the testimony of Dr. Radentz, the State's pathologist. He asserts that Dr. Radentz described the wound on the left side of the victim's head as a "classic exit wound" at a pretrial deposition but described the wound as a "shored exit" that indicated an object rested against the exit point when the bullet exited the wound. He further asserts that Dr. Radentz testified that the suturing of the exit wound did not affect his ability to assess whether it was shored, which, McKinney maintains, contradicts common sense. McKinney also argues that trial counsel acted ineffectively by not insisting that Dr. Radentz appear at the second trial. Instead, the parties read into the record the testimony of Dr. Radentz from the first trial. According to McKinney, the failure to require Dr. Radentz to testify in person forfeited an opportunity to cross-examine him about his questionable conclusions. The problem with this argument is that trial counsel competently highlighted these exact points to the jury on cross-examination, and the second jury heard those points when the testimony was read to them. And these points were able

to be made without the aid of an opposing pathology expert, which indicates a lack of prejudice. Trial Tr. 340-48.

At the post-conviction stage, trial counsel testified that she agreed to use Dr. Radentz's testimony from the first trial due to her concern that his testimony would change in favor of the prosecution's case, noting that the Brunos' testimony did just that. PCR Tr. 25-26. The record thus indicates that trial counsel's decision to agree to use Dr. Radentz's testimony from the first trial was a strategic decision.

McKinney also asserts that Dr. Radentz falsely testified that there were no bullet fragments in the victim's head, but, after reviewing the trial transcript, I cannot find such testimony in the trial transcript, and McKinney offers no citation. He also asserts that other witnesses falsely testified about the absence of bullet holes in the trailer home, but it is unclear how this relates to Dr. Radentz's testimony, pathology, or the performance of trial counsel. Accordingly, I find that post-conviction counsel was not ineffective for declining to pursue a claim regarding trial counsel's approach on expert pathology evidence.

### c.   Firearms Expert

McKinney argues that he is entitled to habeas relief because trial counsel and PCR counsel failed to present a firearms expert to challenge the prosecution witnesses' testimony. He asserts that a firearms expert could have contradicted the testimony of David Brundage, the prosecution's firearm expert, that the gun was capable of falling apart when dropped on the floor. He asserts that a firearms expert could have also testified that the gun was capable of being fired when it was dismantled.  First, I note

that McKinney doesn't establish that these propositions about firearms are true, and would have been testified to by an expert.  In any event, McKinney contends that such testimony would have supported the self-defense strategy that he proposed at the post-conviction evidentiary hearing. As set forth above, the State court's determination regarding trial counsel's defense strategy was reasonable, and trial counsel did not perform deficiently by failing to present expert testimony to support an alternative one.

McKinney asserts that a firearms expert could have contradicted Brundage's testimony that the gun had a blue finish rather than a nickel-plated finish, and that the gun was made in Miami, Florida, rather than Italy. Here, again, McKinney provides no citations to the record, and I am unable to find such testimony in the trial transcript. Moreover, it is unclear why McKinney believes that such contradictions are material or how they would have had any effect on the outcome of the trial.

McKinney further asserts that law enforcement failed to adequately search the trailer home for bullet holes; that Detective Brown prepared an incident report regarding stolen evidence but later rescinded it; the absence of photographs of the gun with visible serial numbers; that Detective Brown abruptly left his deposition at the prosecuting attorney's direction; and that the chain of custody documentation for the gun was flawed. These assertions suggest that McKinney believes that the gun produced at trial was not the gun used to kill the victim. Even assuming that the prosecution engaged in such a tactic and that it inured to their benefit at trial, these topics are outside the expertise of a firearms expert. Accordingly, I find that post-

conviction counsel was not ineffective for declining to pursue a claim regarding trial counsel's approach on expert firearm evidence.

### d. Chain of Custody

McKinney argues that he is entitled to habeas relief because PCR counsel and trial counsel did not challenge the chain of custody for the gun. He notes discrepancies in the chain of custody documentation and Detective Brown's rescinded report that the gun and other evidence were stolen. He implies that the prosecution presented a different gun at trial, but he does not explain how this tactic could have prejudiced his case. There is no dispute that McKinney's gun was used to kill the victim, that it was fired twice in the trailer home that night, or that it fired the bullet lodged in McKinney's hand. The material dispute at trial was the identity of the individual who fired the gun at the victim. Under McKinney's proposed defense strategy, the material dispute would have been his intent as he fired the gun at the victim. Because it is unclear that a challenge to the chain of custody would have had any effect on the outcome of the trial, I find that post-conviction counsel was not ineffective for declining to pursue a related ineffective assistance of trial counsel claim.

### e. Prosecutorial Misconduct

Finally, McKinney argues that he is entitled to habeas relief because trial and PCR counsel did not challenge the prosecution's presentation of forensic witnesses as prosecutorial misconduct. He asserts that these witnesses falsely documented the chain of custody for evidence, falsely testified that they could test for blood that they could not see with the naked eye, falsely testified that the victim's exit would was a shored

exit, changed their opinion about whether the gun could fall apart if dropped, falsely testified that the victim's head had no bullet fragments, and falsely testified that sutures did not alter the appearance of the victim's exit wound.

"In reviewing a claim of prosecutorial misconduct properly raised in the trial court, [Indiana courts] determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.* For each of McKinney's assertions, there is little to suggest the witness knowingly produced false evidence or presented false testimony, and there is nothing to suggest that the prosecution knowingly presented such false evidence at trial. Nor it is clear that this alleged misconduct would have had a meaningful effect on the jury's decision. To the extent that the record contains any support for McKinney's assertions, his trial counsel noted the discrepancies with the witnesses' testimony at trial; specifically, the testimony regarding whether the victim's exit wound was a shored exit, whether the gun could fall apart if dropped, and whether sutures altered the appearance of the victim's exit wound.

McKinney further asserts that jail staff's refusal to remove the bullet from his hand constitutes prosecutorial misconduct. This assertion is an even less viable basis for a prosecutorial misconduct claim as there is no indication that the prosecution or their witnesses had any involvement with McKinney's medical treatment at the Marion

County Jail. Consequently, I find that post-conviction counsel was not ineffective for declining to pursue an ineffective assistance of trial counsel claim with respect to prosecutorial misconduct.

## Certificate of Appealability

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging McKinney to proceed further.

**ACCORDINGLY:**

Petitioner Chad McKinney's amended habeas corpus petition is DENIED.

A certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11 is DENIED.

McKinney's motion to expand the record [DE 63] is DENIED AS MOOT.

The Clerk is directed to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on November 17, 2020.

  /s/ Philip P. Simon
JUDGE
UNITED STATES DISTRICT COURT